# United States District Court

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

JUN 11 2012

CLERK, U.S. DISTRICT COURT
By_____
Deputy

__NORTHERN__ _____ DISTRICT OF _____ TEXAS

**In the Matter of the Search of**
(Name, address or Brief description of person, property or premises to be searched)

The property utilized by JOSE TREVINO, ZULEMA TREVINO
and TREMOR ENTERPRISES, LLC, located at 12909 Timothy
Lane, Balch Springs, Texas

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER: 3:12-mj-255

I Jason R. Preece being duly sworn depose and say:

I am a(n) __Special Agent with the Federal Bureau of Investigation (FBI)__ and have reason to believe that on the property or premises
known as that property utilized by JOSE TREVINO, ZULEMA TREVINO and TREMOR ENTERPRISES, LLC, located at 12909
Timothy Lane, Balch Springs, Texas

in the _____ __NORTHERN__ _____ District of _____ __TEXAS__ _____ there is now concealed a certain person
or property, namely (describe the person or property to be seized)

(See Attachment A)

**which is**
property that constitutes evidence of the commission of a criminal offense; or contraband, the fruits of crime, or things otherwise criminally
possessed; or property designed or intended for use or which is or has been used as the means of committing a criminal offense.

**concerning a violations of Title __18__ United States Code, Section(s) __1956 and 1957__.  The facts to support a finding of Probable Cause
are as follows:**

See attached affidavit.

**Continued on the attached sheet and made a part hereof.        x Yes        No**

_Jason R. Preece_
Jason R. Preece
Signature of Affiant

Sworn to before me, and subscribed in my presence

Date: June 11, 2012

at   __Dallas, Texas__
     City and State

__Jeff Kaplan, United States Magistrate Judge__
Name and Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Jason R. Preece, having been duly sworn, depose and state as follows:

1.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been employed in this position since 2004.  I make this affidavit in support of an application by the United States of America for the issuance of a warrant to search the following premises associated with an ongoing money laundering conspiracy:

**The property utilized by JOSE TREVINO, ZULEMA TREVINO, AND TREMOR ENTERPRISES LLC, located at 12909 TIMOTHY LANE, BALCH SPRINGS, TEXAS**

2.     During this time period, I have been involved in investigations of individuals who derive substantial income from the illegal importation, manufacture, distribution, and sale of illegal controlled substances. I have assisted and participated in these types of investigations with the *Internal Revenue Service (IRS), United States Drug Enforcement Administration (DEA) and the United States Attorney's Office (USAO).*  In addition, I have had experience in the execution of financial search warrants, narcotic search warrants, debriefing defendants, participant witnesses, informants, and other persons who have personal knowledge of the amassing, spending, converting, transporting, distributing, laundering and concealing of proceeds of narcotics trafficking.

3.     This affidavit supports the request for a warrant to search locations associated with this money laundering organization.  Affiant has probable cause to believe that residences and business have been used to commit and are continuing to be used to commit, and contain evidence of violations of Title 18 U.S.C. §§ 1956 and 1957, as described more fully herein.

4.     There is probable cause to believe that within the premises to be searched are the following items:

a.     Books, records, sales and/or purchase invoices, receipts, notes, ledgers, bank records, money orders, papers, and files relating to the receipt, disposition and laundering of the proceeds from the distribution of illegal Controlled Substances, to wit: cocaine.

b.     Horse related records to include purchase documents, titles, registration, horseman's account records, veterinarian records, Coggins records, feed records, and American Quarter Horse records.

**Affidavit - page 1**

c.      Currency, financial instruments, precious metals, jewelry and/or other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, laundering, secreting or spending large sums of money made from the distribution of illegal Controlled Substances;

d.      Telephone and address books, records, or papers which reflect names, addresses and/or telephone numbers of individuals involved in the illegal activities of the organization, including the trafficking of illegal Controlled Substances and the laundering of its proceeds;

e.      Photographs, including still photographs, negatives, video tapes, films, undeveloped film and the contents therein, slides, of individuals, property, horses, including photographs of co-conspirators, of assets, and proceeds;

f.      Counter-surveillance equipment including but not limited to video surveillance devices, including night-vision devices, electronic listening devices, motion sensors, alarms, and communication devices including but not limited to two-way radios;

g.      Electronic communication devices including cellular telephones, telephone answering machines, caller identification devices, and the electronically stored contents of such devices, including answering machine tapes and the stored telephone numbers and information from cellular telephones, caller identification devices and electronic paging devices;

h.      Computers, computer hard drives, and data, information stored on computers, electronic files, disks peripheral storage devices, peripheral input/output devices, computer related documentation, and software which contain information requested in all closed and/or locked containers containing the information requested herein relating to the receipt, disposition, and laundering of the proceeds from the distribution of illegal Controlled Substances, to wit: cocaine.

5.      The controlled substance/money laundering organization's continued involvement in the sale and distribution of illegal controlled substances and the resulting financial crimes are in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1), 846 and 18, U.S.C. §§ 1956 and 1957.  Based on my experience and training I know the following:

a.      Individuals who engage in the laundering of illicit funds routinely conceal in their residences, vehicles, places of operation, and places of business caches of large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of money laundering operations;

**Affidavit - page 2**

b.      Individuals who engage in the laundering of illicit funds maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the concealment, transportation, and distribution of illegally obtained funds.  The need for maintaining records increases with large-scale, and more lucrative criminal organizations since greater amounts of proceeds frequently results in numerous, complex financial transactions.  The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the benefactor of the money laundering operation has ready access to them including but not limited to on his/her person, in his/her motor vehicles, in his/her place of business or place of residence.  These individuals commonly utilize ledger books and computer systems to maintain these records.  Important financial documents, including records documenting the value of significant assets are normally maintained for long periods of time.  A long-standing pattern of criminal activity can also support a finding of probable cause to search for these items even if fairly long periods of time have lapsed between the criminal acts and the issuance of the warrant.

c.      Individuals who deal in illegal controlled substances attempt to legitimize the profits they receive from this illegal activity.  To accomplish this goal, these individuals utilize false and fictitious business records, foreign and domestic banks, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate shell corporations and business fronts, and engage others to assist them in these money laundering activities;

d.      Individuals who deal in money laundering operations commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers for their associates in their illegal organization.  In addition, these individuals utilize telephone systems to maintain contact with their associates in their illegal business.  These telephones are often in the primary location of these individual's illegal businesses, be it residence, place of business, or motor vehicles.

e.      Individuals who deal in money laundering operations take or cause to be taken, photographs of themselves, their associates, their property and their illegally obtained assets.  These individuals usually maintain these photographs in their possession or at their residences;

f.      Individuals who deal in money laundering operations commonly violate federal income tax laws by attempting to conceal the true amount and source of their income from the government.

g.      It is common for funds obtained from drug trafficking organizations to have residue traces of controlled substances on the money since the money is frequently

**Affidavit - page 3**

counted by those in contact with the drugs. Law enforcement agencies own canines, which are trained to react to the scent of controlled substances, even in trace amounts. These trained canines have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of money launderers.

h.      Individuals who deal in money laundering operations commonly utilize cellular telephones to maintain contact with their clients and co-conspirators. Often these individuals utilize these devices to maintain or store the telephone numbers and other information about their co-conspirators where they will have easy access to them.

i.      Firearms are often associated with associates of violent cartels. *Affiant has been involved in search warrants involving money launderers and cartel associates and can state that on occasion the suspects were found to be in possession of firearms. Affiant knows that these firearms are used by cartel associates to protect their illegal enterprises.*

j.      Cartel associates and money launderers typically utilize counter-surveillance equipment to warn them of possible intruders, including law enforcement. *Affiant has personally observed such equipment present at cartel associates and money launderers' residences.*

## COMPUTER-RELATED ISSUES

**Computers are Instrumentalities and Store Evidence.** Your affiant knows based upon training and experience that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime.

## Definitions

**Definition of Computer.** The term "computer", as used herein, is defined pursuant to Title 18, United States Code, § 1030(e)(1), as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

**Affidavit - page 4**

Computer hardware and computer software may be utilized to store records which include those related to business activities, criminal activities, associate names and addresses, and the identity and location of assets illegally gained through criminal activity. The terms records, documents, and materials include all information records in any form, visual or aural, including the originals and all non-identical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise, including the following:

Written or printed matter of any kind, correspondence, memoranda, notes, diaries, statistics, letters, telephone toll records, telegrams, contracts, reports, checks statements, receipts, returns, summaries, pamphlets, books, ledgers, journals, registers, records, vouchers, slips, bills, calendars, pads, notebooks, files, logs, lists, bulletins, credit materials, data bases, teletypes, telefaxes, invoices, worksheets; and,

Graphic records or representations, photographs, slides, drawings, designs, graphs, charts, pictures, sketches, images, films, videotapes, and aural records or representations, tapes, records, disks.

The term records, documents, and materials include all of the foregoing, in whatever form and by whatever means, the records, documents, or materials, and their drafts, or their modifications that may have been created or stored, including: any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic forms (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, ZIP disks, CD-ROM disks, DVD disks, optical disks, printer buffers, smart cards, electronic dialers, or electronic notebooks, tapes, flash or thumb drives, personal digital assistants, digital video recorders, memory sticks, as well as printouts or readouts from any magnetic storage device).

**Definition of Computer Hardware.** Computer hardware which consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing units, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral

**Affidavit - page 5**

input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, network routers or hubs, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

**Definition of Computer Software.** Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

**Internet.** The Internet is a global computer network which electronically connects computers and allows communications and transfers of data and information across state and national boundaries. To gain access to the Internet, an individual utilizes an Internet service provider (ISP). These ISP's are available worldwide. When an individual communicates through the Internet, the individual leaves an Internet Protocol (IP) address which identifies the individual user by account and ISP.

**Computer Documents.** Computer-related documentation which consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

**Computer Security.** Computer passwords and other data security devices which are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

**Seizure of Electronic Storage Devices.** Based upon your affiants knowledge, training and experience, and consultations *computer investigative specialists*, your affiant knows that the search and seizure of information from computers often requires agents to

seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following.

**The volume of evidence.** Computer storage devices (like hard disks, diskettes, tapes, laser disks, RAID arrays) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine whether particular files is evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

**Technical requirements.** Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

**Procedures for Seizing Electronic Data.** Based upon your affiants knowledge, training and experience, and consultation with William C. Gates, Special Agent-Computer Investigative Specialist with the Internal Revenue Service Criminal Investigation Division, your affiant knows that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In

**Affidavit - page 7**

addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as, all related instruction manuals or other documentation and data security devices.

**Request to Move Computers Off-Site To Search Before Return**. Therefore, your affiant requests that your affiant be permitted to remove the computer hardware, computer software, disks, instruction/operating manuals, peripherals, and interconnecting cable/wire to an off-site location where the computers can be searched, and the information authorized to be seized by this warrant downloaded and copied.

## THE UNDERLYING DRUG ORGANIZATION

LOS ZETAS Drug Cartel is a powerful drug organization operating out of Mexico which funnels thousands of kilograms of cocaine into the United States each year. LOS ZETAS are the largest drug cartel in Mexico in geographical presence and control 11 states within Mexico. The organization is based in Nuevo Laredo, Tamaulipas, directly across the border from Laredo, Texas. The huge-scale drug trafficking of this organization generates multi-million dollar revenues.

This investigation centers on the funneling of drug proceeds from Miguel Angel Trevino Morales, a.k.a. "40," and his brother Omar Trevino Morales, a.k.a. "42," into the United States. Miguel Angel Trevino Morales, a.k.a. "40," (hereafter referred to either by first and last name or just "40"), and Heriberto Lazcano, a.k.a. "3," are the top leaders of LOS ZETAS. One of "40's" brothers, Omar Trevino Morales, a.k.a. "42," (hereafter referred to either by first and last name or just "42") is also integrally involved with him in LOS ZETAS.

Numbers associated with names were first assigned at the inception of LOS ZETAS to show members' rank within the criminal organization (the "3," therefore, would demonstrate third in rank in the overall organization when LOS ZETAS was first organized). Miguel Trevino-Morales and Omar Trevino-Morales joined LOS ZETAS and were assigned numbers 40 and 42. In the last several years, however, killings and captures have eliminated those previously designated as higher ranking members, and "3" and "40" have now assumed top leader status. Both Heriberto Lazcano and "40" have $5 million dollar bounties for their capture within the United States (as well as million dollar bounties in Mexico) and have pending federal drug-trafficking related indictments pending in the United States. This makes it difficult for either to travel freely within the United States or to place assets in their own names.

As will be further described in this affidavit, "40" and his brother "42" utilize another brother living within the United States, JOSE TREVINO-MORALES, *(whose property is the subject of this search warrant affidavit)* as well as other contacts to help launder their drug money. The affidavit reveals that "40" has actually stated to others that the horse business is an easy way to launder money. Over the last two years, "40," and "42" have funneled approximately $1 million a month to purchase race horses within the United States (specifically Quarter Horses which excel at racing shorter distances).

The ownership of the horses and the source of the funds to purchase the horses are placed in nominee names to disguise "40's" and "42's" connection to these assets. This helps legitimize the appearance of their drug money since horse racing is a legal activity and also provides "40," "42," and those working with them, free standing assets that can later be sold or "cashed in." It also generates legitimate looking income during the intervening time period. Wage records, as further detailed below, demonstrate that JOSE TREVINO did not have a legitimate source of income significant enough to pay for the expensive horses transferred to him or to pay the hundreds of thousands of dollars for the horses' ongoing care.

## HISTORY OF CASE AND EVIDENCE
## ESTABLISHING PROBABLE CAUSE

The following information has been obtained from bank records, American Quarter Horse Association records, state racing commission records, surveillance, consensual phone calls, wire transfer and currency transaction records, Secretary of State records revealing ownership information of relevant entities, workforce commission earning and tax records, border crossing records, statements from concerned citizens and witness interviews, as well as information obtained from cooperating witnesses whose information has been deemed reliable and credible because it has been substantiated from the afore-described sources of information.

These sources of information demonstrate that JOSE TREVINO is part of an ongoing criminal enterprise. This criminal enterprise has been involved with specified unlawful activity on a daily basis over a period of years. Due to the size of the profits obtained from the immense drug trafficking activities of the organization, there is a great need to keep track of the significant and numerous monetary assets obtained with the proceeds. Some of the valuable assets of the organization are composed of the American Quarter Horse breed of race horses which are expensive to purchase and maintain. Many of these valuable assets have been transferred to JOSE TREVINO. As will be further demonstrated below, the organization generates records in connection with the valuable assets it obtains.

**Affidavit - page 9**

In January 2010, the Heritage Place Auction House in Oklahoma City, OK auctioned two Quarter Horses-DASHIN FOLLIES, which brought a winning bid of $875,000, and CORONITA CARTEL, which brought a winning bid of $250,000. Shortly after the sale, the Federal Bureau of Investigation (FBI) received information from a confidential source in Mexico that these two horses were purchased by "40" and "42," of LOS ZETAS Drug Trafficking Organization (DTO). The confidential source's information is deemed reliable and credible because the information has been independently corroborated by this investigation as referenced above.

As the FBI began obtaining information regarding the purchases of over a million dollars worth of Quarter Horses by "40" and "42" in January of 2010, the Internal Revenue Service, Criminal Investigation, was simultaneously conducting a financial investigation into JOSE TREVINO- MORALES ("40" and "42's" brother living in the United States) and his business, TREMOR ENTERPRISES LLC. The investigations of the two agencies were merged in February 2011.

The subsequent investigation revealed that beginning in at least 2009, members of LOS ZETAS Drug Trafficking Cartel based in Mexico, consisting of cartel co-leader "40" and his brother "42," began to launder drug proceeds through the American Quarter Horse Industry. More specifically, "40" and "42" provided the resources and funds to establish their brother, JOSE TREVINO, as the front man for their Quarter Horse business in the United States. To facilitate this money laundering operation, JOSE TREVINO established TREMOR ENTERPRISES LLC, 66 LAND LLC and ZULE FARMS LLC as some of the front businesses.

A number of people were utilized by "40" and "42" to bid on horses at various auctions in California, New Mexico, and Oklahoma. RAMIRO VILLARREAL, CARLOS NAYEN, FERNANDO GARCIA, and others would bid on the horses. Mexican businessmen, to include RAMIRO VILLARREAL through BASIC ENTERPRISES, ALEJANDRO BARRADAS LAGUNES through GRUPO ADUANERO INTEGRAL AGENCIA ADU, and FRANSCISCO COLORADO CESSA through personal checks and ADT PETROSERVICIOS, would send payments to the various auction houses in the form of wire transfers and personal checks to pay for the horses to give the appearance that the funds were coming from legitimate sources.

After the horses were purchased, ownership would be placed in various nominee names and then the horses were boarded at different ranches throughout the Southwest United States. Once certain horses become profitable, either through the winnings of high stakes horse races or through the sale of breeding rights to successful race horses, ownership of the horses would then be transferred to JOSE TREVINO, or various companies

**Affidavit - page 10**

established for his benefit. The purchase would be made at no or minimal purchase price (from the name of the front company or nominee) which enabled JOSE TREVINO to show large, apparently legitimate profits from minimal investments. As will be further demonstrated in this affidavit, sometimes the purchase paperwork connected to JOSE TREVINO's obtaining the horse would be backdated. This would convey the false impression that he had purchased the horse prior to when the horse became profitable (to explain such a low purchase price).

CARLOS NAYEN has been identified as the person in charge of the payments for boarding, breeding and training the horses. The expenses have been paid by various members of the organization at the direction of NAYEN. These payments have included wire transfers from Mexico, bulk currency payments (derived from the sale of cocaine), bulk currency (sometimes smuggled across the Texas/Mexico border to avoid Currency Monetary Instruments Report) and then deposited into bank accounts, including structured currency deposits into bank accounts.

CARLOS NAYEN established CARMINA LLC as a business to help facilitate the laundering of funds through the American Quarter Horse Industry. NAYEN recently applied for immigration status using his own company, CARMINA LLC, as a reference.

## SPECIFIED UNLAWFUL ACTIVITY #1– DISTIBUTION OF COCAINE Title 21 USC SECTION 846

6.     On November 14, 2011, and on January 24, 2012, a confidential informant referred to as CI #1 was interviewed by law enforcement agents. CI #1 is cooperating with law enforcement in hopes of receiving consideration for federal drug conspiracy charges. The information provided by CI #1 has been corroborated by other witnesses, seizures and documents. CI #1 provided the following information:

7.     CI #1 stated that he met "42" in 2008, through (FNU) (LNU), who he knew as Moy. At that time Moy was a Zeta Comandante in Piedras Negras, with whom CI #1 was conducting drug distribution activities. One day, CI #1 called Moy on his cellular telephone and "42" answered the phone and asked CI #1 who CI #1 was. After the conversation on the phone, "42" then went to see CI #1. OMAR TREVINO was with Mamito (JESUS ENRIQUE REJON AGUILAR) and FNU LNU, only known as Metro. OMAR TREVINO asked CI #1 how much CI #1 owed for unpaid narcotics debts. According to "42," the books were off by approximately $750,000. CI #1 told "42" that CI #1 didn't owe anything, but OMAR TREVINO still took CI #1 to see LOS ZETAS' accountant, FNU LNU, referred to as Cuno. According to Cuno and "42," CI #1 still owed approximately $18,000. CI #1 didn't want any problems, so CI #1 paid "42" the

$18,000. CI #1 rode with "42" all night. At this time "42" told CI #1 that he had killed Moy because Moy was stealing from him. By the next day, "42" and his people had picked up 20 other people. OMAR TREVINO told CI #1 that these people were "contras" (rivals).

8.    During this time, CI #1 owned a number of Quarter Horses and organized horse races in Mexico. CI #1 had been racing two year old horses since 2000. Mamito loved horses, so CI #1 and Mamito hit it off when they met. They would always talk about horses.

9.    A month and a half later, "42" went to look for CI #1 and wanted CI #1 to compete in a horse race against him. They competed in a couple of races during a four month period, and "42" would always win because of CI #1's knowledge that "42" would get upset at a loss and most likely kill his opponent as a result.

10.    OMAR TREVINO told CI #1 that from now on CI #1 would work for him ("42") and he started giving CI #1 and CELSO MARTINEZ 200 kilograms of cocaine at a time. CI #1 was concerned because CI #1 had never moved this much quantity of cocaine. CI #1 stated that MARTINEZ is a Zeta member and is still in Piedras Negras.

11.    CI #1 met "40," brother of "42," at HECTOR CHAPAS' stables, which were located between Nuevo Laredo and Piedras Negras.

12.    CI #1 has seen "40's" and "42's" brother, JOSE TREVINO, (from the U.S.), approximately five times. CI #1 first met him at a party in Mexico. JOSE TREVINO was with "42." Every time JOSE TREVINO visited his brothers, "40" and "42," he would go and stay in a safe house. Once JOSE TREVINO felt it was safe to move, he would go see "40" and "42." They would party together for a few days until JOSE TREVINO would return to the United States.

13.    CI #1 identified CARLOS NAYEN, who worked for EFRAIN TEODORO TORRES, a.k.a. Z 14, who was killed in a horse race in Veracruz. NAYEN is from Veracruz. Following the death of TORRES, NAYEN became the right hand man for "40's" Quarter Horse interests.

14.    As a result of his association with "40," NAYEN was also moving large amounts of cocaine to Dallas, San Antonio, and Houston through Laredo, Texas. NAYEN is not considered a Zeta.

15.    From October 2010 through January 2011, CI #1 gave NAYEN 25 kilograms of

cocaine every two weeks.  NAYEN would get an additional 100 to 200 kilograms in Nuevo Laredo from another source of supply linked to LOS ZETAS.  NAYEN also moved one to one and a half tons of marijuana through the Ports of Entries (POEs) in Laredo, Texas.  Reportedly, NAYEN has never lost any loads of narcotics, and "40" never charges NAYEN a fee as he does for other distributors.  MIGUEL TREVINO had previously punished NAYEN because NAYEN started bragging about working for "40" and was talking too much while he was out at a bar.  NAYEN has also bragged to CI #1 about killing people and how he has proven himself to "40."

16.     FNU LNU, a.k.a. Yoyo, is NAYEN's right hand man.  He is responsible for moving NAYENS' narcotics loads.  Yoyo is from Nuevo Laredo.  According to CI #1, Yoyo has bank accounts that belong to NAYEN.  Yoyo has been in U.S. custody for narcotics violations.  He was released and deported in 2007 or 2008.  Yoyo is about 30 years old, dark skin, tall, chubby, and with curly hair.

17.     FRANCISCO COLORADO CESSA, is like a step-father to CARLOS NAYEN. CI #1 believed that NAYEN was given up as a child by his parents and COLORADO raised him.  If someone threatened COLORADO, he would report it to Los Zetas, and Los Zetas would kill the people who made the threats to COLORADO.  CI #1 met COLORADO at a horse race in Coahuila.  COLORADO owns a lot of horses, and he also coordinates horse races in Mexico.

18.     CI #1 believes the following loads connected to the conspiracy were seized by U.S. law enforcement:

a.      November 2010 - 200 kilograms of cocaine were seized from a warehouse in Laredo, Texas by an unknown Federal agency.  These 200 kilograms belonged to "42."

b.      May or June 2010 - unknown amount of cocaine was seized at Colombia POE in Laredo, Texas.  The cocaine belonged to "42."

c.      June or July 2010 - unknown amount of weapons belonging to "42" were seized in Laredo, Texas.

d.      Date Unknown - twelve million dollars and 150 kilograms of cocaine were seized in Chicago by the Drug Enforcement Administration (DEA).

e.      Date Unknown - 230 kilograms of cocaine were seized in a trailer in Dallas, Texas by DEA.

(Agents have been able to independently confirm the seizure of the loads mentioned in c., d., and e. through law enforcement reporting).

19.     CI #1 was shown several photographs. CI #1 positively identified CARLOS NAYEN, "42," "40," JOSE TREVINO, and EUSEVIO HUITRON.

20.     In 2010, "42" told CI #1 that the U.S. Government held "40" responsible for the murders of over 180 U.S. Citizens, but "42" said in reality "40" was responsible for 385. OMAR TREVINO then went on to say that he was responsible for over 180 murders of U.S. Citizens. OMAR TREVINO further stated that with his own weapon he has killed over 1,000 people, and "40" has killed over 2,000 people. CI #1 asked "42" why he kept a count of the murders. OMAR TREVINO told CI #1 that they just kept record of it.

21.     CI #1 surrendered to law enforcement authorities in 2011. According to CI #1, "40" and "42" accused members of CI #1's crew of workers of supplying law enforcement with information about them. CI #1 was ordered to report to the TREVINOs. CI #1 feared that CI #1 was going to be killed because CI #1 was responsible for the actions of his crew and fled instead.

22.     CI #1 stated that "40" put JOSE TREVINO in the horse race business. JOSE TREVINO has race horses being boarded, trained and bred in Austin, Texas. (TEMPTING DASH has been held at a ranch outside of Austin, Texas for the past several years). OMAR TREVINO told CI #1 that JOSE TREVINO would have never imagined how much money he was going to make from the horse races.

23.     In 2008 or 2009, RAMIRO (GUAJARDO VILLARREAL) from Monterrey, would buy horses at HERITAGE PLACE in Oklahoma City, Oklahoma on behalf of other people from Mexico. Eventually, RAMIRO (GUAJARDO VILLARREAL) started buying race horses on behalf of "40."

24.     CI #1 stated that the horses purchased by RAMIRO (GUAJARDO VILLARREAL) would be paid from Mexican bank accounts owned by legitimate businessmen. The businessmen would wire the money to the U.S. to pay for the horses and then receive cash from "40" and "42." Some of the businessmen used were FRANCISCO COLORADO CESSA, a.k.a. Pancho, RAMIRO's (GUAJARDO VILLARREAL) father, FNU LNU, and FNU BARRADAS (ALEJANDRO BARRADAS LAGUNES). They are currently using ALEJANDRO LNU to pay some of their debts. ALEJANDRO LNU owns money exchange houses in Monterrey.

25.     RAMIRO's (GUAJARDO VILLARREAL) father would also wire money to the

U.S. to pay for horse related expenses as a favor to his son. The father didn't know exactly what the funds were for.

26.     CI #1 stated that RAMIRO (GUAJARDO VILLARREAL) purchased a horse named TEMPTING DASH for "40" and "42." TEMPTING DASH was bought for $28,000.

27.     CI #1 was aware that JOSE TREVINO had a notary public backdate the ownership paperwork to show a change of ownership for TEMPTING DASH. (In 2008 through late 2009, TEMPTING DASH was registered under the name of RAMIRO VILLARREAL. TEMPTING DASH ran in 2 races at Lone Star Park in Grand Prairie, Texas in October 2009 winning over $180,000. Paperwork showing change of ownership was sent to the American Quarter Horse Association on November 14, 2009. The backdated document represented that TEMPTING DASH was sold to JOSE TREVINO on September 29, 2009).

28.     RAMIRO (GUAJARDO VILLARREAL) was paid $50,000 as a bonus because his name was removed as the owner of one of the horses. He was upset because he didn't want to give up the horse.

29.     CI #1 received all horse related expense statements. CI #1 would then call OMAR TREVINO, a.k.a. "42," and give him the total. If the bill was too high, CI #1 had to talk directly to "40." EUSEVIO HUITRON a.k.a. CHEVO always had 20 to 30 horses belonging to "40" at any given time. CI #1 received instructions from "40" or "42" to pay HUITRON between $300,000 and $400,000 in currency for horse related expenses. CI #1 has seen HUITRON at horse races in Mexico where there were armed Los Zetas in attendance. (TEMPTING DASH was boarded and trained by HUITRON in 2009 near Austin, Texas prior to TEMPTING DASH winning Dash For Cash Futurity and the Texas Classic Futurity).

30.     RAMIRO (GUAJARDO VILLARREAL) fell out of favor with "40" because "40" believed that RAMIRO (GUAJARDO VILLARREAL) was stealing from him and due to VILLARREAL's expressed dissatisfaction regarding the transfer of Quarter Horse TEMPTING DASH. (RAMIRO GUAJARDO VILLARREAL was found dead inside of his car in January 2011).

31.     On November 1, 2011, a confidential informant (CI #2) was interviewed by law enforcement agents. CI #2 is cooperating with law enforcement in hopes of receiving consideration for federal drug conspiracy charges. The information provided by CI #2 has been corroborated by other witnesses, seizures and documents. CI #2 provided the

**Affidavit - page 15**

following information:

32.     CI #2 met CI #1 around 1993 or 1994 in Nava, Coahuila, Mexico.  CI #2 began working for CI #1 trafficking marijuana and eventually began trafficking cocaine.  CI #2 would escort narcotics loads to San Antonio, Texas and Houston, Texas.

33.     In approximately 2008, the group lost a load of approximately one hundred (100) kilograms of cocaine in Texas, when it was intercepted by law enforcement.  CI #2 returned to Mexico in fear that U.S. law-enforcement would be investigating CI #2.

34.     In Mexico, CI #2 continued to work for CI #1.  Around this period, in 2009, LOS ZETAS DTO had taken control of Coahuila, Mexico.  CI #1 introduced CI #2 to (FNU) (LNU), a.k.a. Mamito, "40," "42," and FNU CHAPA.

35.     CI #1 and CELSO LNU, a.k.a. Pina, reported to "40" and "42."
In Mexico, CI #2 would stash and distribute marijuana and cocaine.  CI #2 would also count money derived from the sale of narcotics.  Every week, the organization received anywhere from a million and a half to two million dollars.  The most CI #2 ever counted was five million dollars.  All the dollar bills would be inspected, and all the bills with markings would be used to pay bribes to corrupt police officers and other associates.  After the money was counted, it would be placed inside ice chests with foam and locked.  "40's" accountant, FNU LNU, a.k.a. Cuno, would take the ice chests to undisclosed locations.

36.     On November 14, 2011 and on January 24, 2012, a confidential informant (CI #3) was interviewed by law enforcement agents.  CI #3 is cooperating with law enforcement in hopes of receiving consideration for federal drug conspiracy charges.  The information provided by CI #3 has been corroborated by other witnesses, seizures and documents.  CI #3 provided the following information:

37.     CI #3 began trafficking narcotics in Piedras Negras in 2000, working for JESUS FERNANDEZ.  FERNANDEZ worked under VICTOR TRIANA.  CI #3 was caught with 10 kilograms of cocaine at a United States Port of Entry (POE) and served a one year sentence in 2005.  CI #3 was deported back to Mexico after serving a prison sentence.  CI #3 stayed away from drug trafficking until CI #3 met CI #1 in 2007.  CI #3 met CI #1 at horse races and rooster fights in Mexico.

38.     JESUS FERNANDEZ became the father-in-law of "42" in 2007.  FERNANDEZ worked for CI #1 as well.

39.    CI #3 met "42" in 2007.  CI #1 organized rooster fights and horse races.  OMAR TREVINO would be in attendance.

40.    CI #3 met "40" in 2007 in Monclova, Mexico at a rooster fight.  TRIANA had a rooster fighting a rooster of "42."  Approximately fifteen days after the rooster fight, "42" had TRIANA killed because "42's" rooster had lost the fight.

41.    In 2007, CI #3 worked with JESUS FERNANDEZ under CI #1.  They would send kilograms of cocaine from Allende, Mexico to San Antonio, Texas and Austin, Texas every two weeks.  CI #1 and (FNU) (LNU), a.k.a. CELSO, were in charge of the Piedras Negras area.  CI #1 was only responsible for cocaine shipments and CELSO was responsible for cocaine and marijuana shipments out of Piedras Negras.

42.    CI #3 was responsible for arranging bulk currency pickups in Dallas, Texas, Houston, Texas and Chicago, Illinois.  CI #3's main responsibility for "40" was the receiving and distribution of narcotics' proceeds once it arrived back in Mexico.  The bulk cash currency would be driven to either Piedras Negras, Mexico or Nava, Mexico.  CI #3's job was to separate the currency into denominations of 20 dollar bills, 50 dollar bills, and 100 dollar bills.  FNU LNU, a.k.a. CUNO, was LOS ZETAS accountant.  CUNO was very picky about how CI #3's crew turned the money in.  CI #3 had to remove any bills that had any type of markings or that appeared old and dilapidated.  These "dirty" bills would be used in Mexico as bribe payments to various persons.  The "clean" bills would be taken to casa de cambios (money exchange houses) in Mexico.

43.    The organization's main cocaine client was based out of Dallas, Texas.  The client regularly sent bulk cash to CI #3.  On various occasions, CI #3 would have the client's workers take cash from Dallas straight to persons in the United States (U.S.) that were paying debts for the horses for "40."  On one occasion, CI #3 had the client's workers meet the brother of "40," JOSE TREVINO at a Wal-Mart at Buckner Road and Interstate 30 outside of Dallas with $100,000 to $150,000.  JOSE TREVINO waited in a white suburban with his lights on in the parking lot.  This transaction took place in June or July of 2010.

### SPECIFIED UNLAWFUL ACTIVITY #2
### INTERFERENCE WITH COMMERCE BY THREATS OR VIOLENCE TITLE 18 USC SECTION 1951

44.    The evidence detailed below relating to Quarter Horses TEMPTING DASH and MR PILOTO shows that JOSE TREVINO obtained these two horses on behalf of his brothers, "40," and "42," through extortion defined as the obtaining of property from

**Affidavit - page 17**

another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear. As will be further detailed below, witnesses have stated that some horses belonging to LOS ZETAS Drug Cartel, or their associates, (held in nominee names) will be transferred to JOSE TREVINO or his businesses.

45.     On December 14, 2008, your affiant learned from IRSCI Special Agents that Muellar Racing sold a horse named TEMPTING DASH through the Schvaneveldt Ranch Auctions in California. RAMIRO VILLARREAL was listed as the buyer and paid $21,500 for the horse. On October 24, 2009, TEMPTING DASH won the Dash for Cash, in Grand Prairie, Texas with a purse of $178,078.

46.     According to CI #1, VILLARREAL was forced to transfer the ownership of TEMPTING DASH to JOSE TREVINO. VILLARREAL was upset because he didn't want to give up the horse. RAMIRO VILLARREAL was found dead inside of his car in January 2011.

47.     During the September 17 – 19, 2009 Quarter Horse Yearling Sale in Oklahoma City, Oklahoma, RAMIRO VILLARREAL purchased Quarter Horse MAVERICK PERRY, whose name was later changed to MR PILOTO, for $81,000. The ownership of MR PILOTO was later changed to TREMOR ENTERPRISES LLC (JOSE TREVINO's company). The American Quarter Horse Association received the request to transfer ownership of MR PILOTO on September 5, 2010. The ownership documents submitted for JOSE TREVINO indicated he wanted the ownership date to show July 10, 2010.

48.     Records obtained from Bank of America shows that JOSE TREVINO paid $100,000 on October 25, 2010 with the notation "Purchase of MR PILOTO." However that check did not clear the bank account until December 1, 2010. This means that this check did not clear the bank until approximately 5 months after the date JOSE TREVINO represented as the ownership transfer date on the paperwork he submitted for MR PILOTO.

49.     Based on witness information, the threat of death by members of LOS ZETAS Drug Cartel intimidates and coerces individuals to transfer horses to JOSE TREVINO or one of his companies for a price substantially less than the true value of the horses.

## LAUNDERING OF PROCEEDS THROUGH QUARTER HORSE TEMPTING DASH

50.     On December 14, 2008, your affiant learned from IRSCI Special Agents that Muellar Racing sold a horse named TEMPTING DASH through the Schvaneveldt Ranch

**Affidavit - page 18**

Auctions in California.  RAMIRO VILLARREAL was listed as the buyer and paid $21,500 for the horse.

51.     On October 24, 2009, TEMPTING DASH won the Dash for Cash at Lone Star Park, in Grand Prairie, Texas.  RAMIRO VILLARREAL won a race purse of $178,078 because the horse was registered for the race under his name.

52.     On November 14, 2009, the American Quarter Horse Association received paperwork transferring the registration on TEMPTING DASH from VILLARREAL to JOSE TREVINO MORALES a.k.a. JOSE TREVINO.  TREVINO put the date of September 29, 2009 as the date of transfer.  (CI #1 and CI #3 have stated that the document was backdated).

53.     On April 15, 2010, TREVINO transferred the registration for TEMPTING DASH to his business, TREMOR ENTERPRISES LLC.

54.     Records were obtained for a business which maintains some of the racing records and winnings of horses that race in the state of Texas.  The records show the following:

55.     JOSE RAMIRO GUAJARDO VILLARREAL has maintained an account at least since 1-1-2008.

56.     On May 1, 2009, VILLARREAL had a balance on his account with The Horsemen's Bookkeeper of $774.  From May 1, 2009 through October 9, 2009, VILLARREAL had several horses under his name that won over $1,000 at various races in the state of Texas.  These horses included Mr. Jess XI, Mr. Cantador, Eye Shall, Running First, Red Heels, Ja Call Collect, and Million Maid.

57.     The balance of his account remained above $1,250 from May 15, 2009 through October 24, 2009 because of the various purse payments based on the winnings of the horses listed in previous paragraph.

58.     On October 9, 2009, VILLARREAL paid the fee of $1,250 for TEMPTING DASH to enter the qualifying race for Dash For Cash Futurity held at Lone Star Park in Grand Prairie, Texas.

59.     On October 10, 2009, his account was credited $2,100 because TEMPTING DASH won the qualifying race.

60.     On October 24, 2009 his account was credited $178,078 because TEMPTING

**Affidavit - page 19**

DASH won the Dash For Cash Futurity held at Lone Star Park in Grand Prairie, Texas.

61.    On October 29, 2009, his account was debited to pay for photo charges associated with TEMPTING DASH.

62.    On November 12, 2009, VILLARREAL paid the fee of $1,000 for TEMPTING DASH to enter the Texas Classic Futurity.

63.    On November 14, 2009, VILLARREAL had his account credited $2,100 because of a purse transaction related to TEMPTING DASH.

64.    On November 27, 2009 The Horsemen's Bookkeeper issued a check to RAMIRO VILLARREAL in the amount of $139,633.98.

65.    A financial analysis conducted by an IRSCI Special Agent reveals the following:

66.    In 2008, JOSE TREVINO was a brick layer who earned approximately $44,500 from Dee Brown, Inc. and his wife ZULEMA TREVINO, was an office clerk who earned approximately $25,500 from Lakeshore Staffing.  The Trevino's are supporting four children with their income.

67.    In 2009, JOSE TREVINO earned approximately $29,000 from Texas Stone and Tile LLC and Dee Brown, Inc. and his wife, ZULEMA TREVINO, earned approximately $29,000 from Lakeshore Staffing.

68.    The TREVINOs' earnings were deposited into their personal bank account #xxxx xxxx 5000 at Bank of America. Their earnings were expensed on personal living expenses. *Tax* returns and Texas Workforce Commission records substantiate the wages the TREVINOs earned.

69.    From January 1, 2009 to November 25, 2009, there were no withdrawals over the amount of $1000 from his personal bank account #xxxx xxxx 5000 at Bank of America. During that same time frame total deposits from wages were approximately $53,000. The average ending balance was approximately $2000.

70.    JOSE TREVINO has represented to various sources, which information has been corroborated by bank records and American Quarter Horse Association records and has thus been proven credible and reliable that he purchased TEMPTING DASH for "$25,000." JOSE TREVINO's bank records do not reflect a "$25,000" withdrawal from his personal account #xxxx xxxx 5000 at Bank of America to indicate that the purchase

occurred.

71.     The financial investigation shows based on income/expenses, that JOSE
TREVINO did not have income from his or his wife's wages to pay for TEMPTING
DASH.  Based on information from confidential informants and the financial
investigation, the ownership of TEMPTING DASH was transferred to JOSE TREVINO
after it showed promise and could win races.

72.     Records pertaining to JOSE TREVINO's account show the following:

73.     JOSE M. TREVINO opened an account with a business which maintains some of
the racing records and winnings of horses that race in the state of Texas on November 20,
2009.

74.     On November 28, 2009, his account was credited $491,901.66 because
TEMPTING DASH won the Texas Classic Futurity.

75.     A check in the amount of $441,855.23 from the business which maintains some of
the racing records and winnings of horses that race in the state of Texas was issued to
JOSE TREVINO on December 11, 2009 which was deposited into his personal Bank Of
America bank account #XXXX XXXX 5000.

76.     JOSE TREVINO opened another account with the business which maintains some
of the racing records and winnings of horses that race in the state of Texas under the
name of TREMOR ENTERPRISES LLC on January 19, 2010.

77.     Records from Bank of America relating to JOSE TREVINO and his business,
TREMOR ENTERPRISES LLC, were obtained and analyzed.  JOSE TREVINO opened
BANK OF AMERICA ACCOUNT # XXXX XXXX 1054 on December 2, 2009 under
the name of TREMOR ENTERPRISES LLC.  The records show the following:

78.     JOSE TREVINO transferred $435,000 from his Bank of America account XXXX
XXXX 5000 to his TREMOR ENTERPRISES LLC account XXXX XXXX 1054 on
December 21, 2009.

79.     On December 22, 2009, JOSE TREVINO wrote himself a $100,000 check and a
$57,793 check from TREMOR ENTERPRISES LLC account XXXX XXXX 1054 and
deposited the checks into his personal account XXXX XXXX 5000.  A week later JOSE
TREVINO wrote 2 checks from his personal account XXXX XXXX 5000 and put
$157,793 back into the TREMOR ENTERPRISES LLC account XXXX XXXX 1054

**Affidavit - page 21**

thus creating a wash to demonstrate personal income from his business.

80.      In addition to the transferring of funds between accounts, JOSE TREVINO through the TREMOR ENTERPRISES LLC account XXXX XXXX 1054 expended some of the money.  He paid Rodolfo Trevino $11,000 as a "Referral," paid Huitron Homes Inc, $52,318.20 for "Monthly stables, trainer fees/10% Prize winning" relating to TEMPTING DASH (Huitron Homes, Inc. is a business entity owned by EUSEVIO HUITRON who was the trainer for TEMPTING DASH), Fred Stanley Equine Ins was paid $100,405.90 for "Tempting Dash Ins" ($77,277.37 was refunded to account on 4/21/2010), RAMIRO VILLARREAL was paid $15,000 and CARLOS NAYEN BORBOLLA (CARMINA LLC) was paid $15,000.

81.      On November 1, 2011, CI #2 was interviewed by law enforcement agents.  CI #2 provided the following information:

82.      CI #2 first heard about a racehorse named TEMPTING DASH in 2009.  When TEMPTING DASH was first bought, he was taken to Mexico but then was brought back to the U.S.  TEMPTING DASH's name in Mexico was "El Huesos."  CI #2 was not sure where TEMPTING DASH was purchased, but knew that "40" purchased race horses in Ruidoso, New Mexico and Oklahoma.

83.      In 2009, CI #2 heard "40" say that he had spent two million dollars on horses.  Some of the horses are taken to Mexico, but the better horses are brought back to the U.S.

84.      On November 14, 2011 and January 24, 2012, CI #3 was interviewed by law enforcement.  CI #3 provided the following information:

85.      CI #3 stated that the two most known horses that "40" had in the United States were TEMPTING DASH and MR PILOTO.  TEMPTING DASH was purchased by RAMIRO VILLARREAL and placed in his name.  When TEMPTING DASH started winning races, a notary public, did a transfer of ownership for "40."  TEMPTING DASH went from RAMIRO VILLARREAL's name to the name of "40's" brother, JOSE TREVINO. CI #3 physically saw the transfer paperwork.

86.      CI #3 was present with "40" and "42" on multiple occasions when they discussed TEMPTING DASH.

87.      TEMPTING DASH became very successful but had to retire early because of pyroplasmosis, a blood borne tick disease that prevents racing.  TEMPTING DASH is currently being held at a quarter-horse breeding facility called Southwest Stallion Station

**Affidavit - page 22**

for breeding purposes.

88.     Based on the information provided, affiant believes that the breeding of
TEMPTING DASH to horses under the control of JOSE TREVINO and CARLOS
NAYEN was a way to launder additional funds and provide a cash flow for JOSE
TREVINO.

## LAUNDERING OF PROCEEDS THROUGH
## QUARTER HORSE MR PILOTO

89.     Records obtained from Heritage Place Auctions in Oklahoma City, Oklahoma
show that RAMIRO VILLARREAL, agent, purchased 18 horses for $430,800 during the
September 17 – 19, 2009 Quarter Horse Yearling Sale taking place in Oklahoma City,
Oklahoma.  MAVERICK PERRY (MR PILOTO) was one of the horses purchased
costing $81,000.  The $430,800 owed to Heritage Place was paid in the following
manner:

| | | |
|---|---|---|
| 9/25/2009 | Basic Enterprises Mx wire | $68,000 |
| 9/28/2009 | Basic Enterprises Mx wire | $100,000 |
| 10/5/2009 | Basic Enterprises Mx wire | $80,000 |
| 10/7/2009 | Basic Enterprises Mx wire | $80,000 |
| 10/9/2009 | Basic Enterprises Mx wire | $60,000 |
| 10/15/2009 | Basic Enterprises Mx wire | $60,000 |

90.     Records obtained from the American Quarter Horse Association show that a horse
originally named MAVERICK PERRY (MR PILOTO) was purchased by RAMIRO
VILLARREAL on September 17, 2009 for $81,000.  The name of MAVERICK PERRY
was changed to MR PILOTO.  (CARLOS NAYEN has the nickname of PILOTOS).  The
ownership of the horse changed to GARCIA BLOODSTOCK & RACING which is
owned by FERNANDO GARCIA on January 15, 2010.  FERNANDO GARCIA is an
associate of CARLOS NAYEN and helps him conduct various transactions.  On July 10,
2010, the ownership of MR PILOTO was changed to TREMOR ENTERPRISES LLC.

91.     Bank of America records relating to JOSE TREVINO's BANK OF AMERICA
ACCOUNT # XXXX XXXX 5000 and TREMOR ENTERPRISES LLC BANK OF
AMERICA ACCOUNT # XXXX XXXX 1054 do not reflect any funds being paid to
GARCIA BLOODSTOCK & RACING in or about July 2010 for the purchase of MR
PILOTO.  (Witnesses have stated that MR PILOTO is owned by members of the Los Zeta
Drug Trafficking Organization).

**Affidavit - page 23**

92.     Records obtained from the Ruidoso Downs Race Track shows the following:

TREMOR ENTERPRISES LLC (owned by JOSE TREVINO) opened a Horseman's account on May 23, 2010.

On August 14, 2010, JOSE TREVINO paid a $50,000 late entry fee for Quarter Horse FEATURES HONOR to race in the All American Futurity.  (This money came from the TREMOR ENTERPRISES LLC Bank of American account XXXX XXXX 1054 after it was wired into the account from Laredo Transmissions Solutions, a money exchange house in Laredo, Texas).

FEATURES HONOR did not win the race and the money was lost.

The entry fee for MR PILOTO had been paid on time by RAMIRO VILLARREAL and GARCIA BLOODSTOCK & RACING.  Total entry fee paid on time for MR PILOTO was $4,075.

On September 6, 2010, the account of TREMOR ENTERPRISES LLC was credited with $968,440 as MR PILOTO won the All American Futurity race at Ruidoso Downs Race Track.  $100,000 was paid to the jockey and a check in the amount of $899,549.70 was deposited into Bank of America TREMOR ENTERPRISES LLC account XXXX XXXX 1054.

93.     Records from Bank of America relating to JOSE TREVINO and his business, TREMOR ENTERPRISES LLC, were obtained and analyzed.  JOSE TREVINO opened Bank of America account XXXX XXXX 1054 on December 2, 2009 under the name of TREMOR ENTERPRISES LLC.  The records show the following:

Ruidoso Downs Race Track check in the amount of $899,549.70 was deposited into Bank of America TREMOR ENTERPRISES LLC account XXXX XXXX 1054.

JOSE TREVINO through the TREMOR ENTERPRISES LLC account XXXX XXXX 1054 expended some of the $899,549.70.  The following withdrawals in excess of $10,000 were expended through the following means:

FELIPE QUINTERO, $100,000, 10% Purse All American Futurity.  (FELIPE QUINTERO was listed as the trainer for MR PILOTO).

$100,000,purchase of MR PILOTO. (This expenditure cleared the bank in December 2010, approximately three months following the All-American Futurity).

94.    On November 1, 2011, CI #2 was interviewed by law enforcement agents.  CI #2 provided the following information:

95.    MR PILOTO is another race horse owned by "40."  The horse was transferred to TREMOR ENTERPRISES, which is owned by "40's" brother, JOSE TREVINO.  CI #2 was shown a photograph of JOSE TREVINO and stated that the photograph looked like JOSE TREVINO.

96.    On one occasion, "40" talked about how they change the names of the horse owners on documents to disguise ownership and alter the documents to make the horses seem cheaper.

97.    CI #2, CI #1, "40," "42," and CARLITOS LNU watched MR PILOTO's race on the internet.  At this race, "40" stated that he and his associates paid approximately ten thousand dollars to the gatekeepers to hold back the horses competing against MR PILOTO.  When MR PILOTO won, "40" stated that his brother, JOSE TREVINO used to be a bricklayer and would wake up at 5 a.m. every day.

98.    CARLOS NAYEN is a horse trainer who takes care of all of "40's" horses in the U.S.  CARLOS NAYEN's step-father owns PEMEX in Veracruz, Mexico and also has horses in Veracruz.  CI #2 was shown a photograph of CARLOS NAYEN, and he positively identified him.

99.    CARLOS NAYEN used the Blackberry messaging to communicate with "40."  (CI #1 saw some of the messages from NAYEN to MIGUEL TREVINO).

100.   Based on the information provided, affiant believes that the breeding of MR PILOTO to horses under the control of JOSE TREVINO and CARLOS NAYEN was a way to bring (launder) additional funds and provide a cash flow for JOSE TREVINO.

**LAUNDERING OF PROCEEDS THROUGH JOSE TREVINO AND ZULEMA TREVINO OPERATING UNDER VARIOUS NAMES TO INCLUDE TREMOR ENTERPRISES, TREMOR ENTERPRISES LLC, 66 LAND LLC, ZULE FARMS LLC, AND THEIR NOMINEES.**

101.   In addition to the horses listed above, the organization has obtained a number of horses at various horse auctions at Heritage Place in Oklahoma City, Oklahoma, Ruidoso Downs Horse Sales Company in Ruidoso Downs, New Mexico, and Los Alamitos Equine Sale in Los Alamitos, California.  The horses were purchased through various individuals to include RAMIRO VILLARREAL, CARLOS NAYEN, FRANCISCO COLORADO

CESSA, ALEJANDRO BARRADAS, SERGIO RINCON, RAUL RAMIREZ, and others. The horses were placed under various names and LLCs with the control overseen by JOSE TREVINO, CARLOS NAYEN and their associates.

102.   Evidence presented above shows that JOSE TREVINO became involved with the laundering of proceeds through the Quarter Horse industry in 2009.

103.   On November 14, 2011 and on January 24, 2012, CI #1 was interviewed by law enforcement agents. In addition to information provided earlier in the affidavit, CI #1 provided the following:

104.   CARLOS NAYEN assisted MIGUEL TREVINO-MORALES in the horse business. He would purchase horses. NAYEN placed the horses in the names of Mexican business owners. NAYEN sometimes used banks in Nuevo Laredo to wire the funds to American debtors. He had his account frozen in Nuevo Laredo one time.

105.   Horses were boarded at various locations. One of these locations had approximately 40 to 42 horses belonging to MIGUEL TREVINO. CI #1 for 3 months of horse related expenses through NAYEN. CI #1 gave NAYEN $500,000 cash, and then NAYEN paid for the expenses through bank wire transfers.

106.   In 2010, CI #1 paid a total of four million dollars for horse related expenses. CI #1 admitted that the money used to pay for the horse related expenses was all proceeds from the sale of narcotics.

107.   Records obtained from the Texas Secretary of State show that JOSE TREVINO established TREMOR ENTERPRISES LLC on December 1, 2009.

108.   In approximately October 2011, ZULE FARMS LLC was established. JOSE TREVINO filed documents with the Oklahoma Bred Registry claiming ownership of 66 LAND LLC and ZULE FARMS LLC.

109.   Records obtained from Los Alamitos Equine Sales, Heritage Place, Ruidoso Downs Horse Sales Company, and Oklahoma Racing Commission were analyzed. The analysis of the records reveals the following:

110.   During the Heritage Place 2008 Fall Mixed Sale held October 24–25, 2008, RAMIRO VILLARREAL purchased 11 horses for a total cost of $96,900. This included Quarter Horses MEMORIES FORMICHA and CRESCENT MOON DASH. Both of these horses were eventually transferred to 66 LAND LLC, business of JOSE TREVINO

in January 2012. Most of the money used to pay for the purchase of the horses came in the form of wire transfers from Basic Enterprises in Mexico.

111.   On October 3 and 4, 2009, RAMIRO VILLARREAL purchased 18 horses at the Los Alamitos Equine Sale for a total price of $502,970. Most of the payments were from BASIC ENTERPRISES. This included Quarter Horse BLUES GIRLS CHOICE. American Quarter Horse Association records show that the ownership of BLUES GIRLS CHOICE was transferred to TREMOR ENTERPRISES LLC on October 5, 2009. JOSE TREVINO through TREMOR ENTERPRISES raced BLUES GIRLS CHOICE in California in June 2010. He then sold BLUES GIRLS CHOICE through the Heritage Place auction on November 5, 2011 for a reported $102,000.

112.   On October 23, 2009, RAMIRO VILLARREAL purchased 9 horses at the Heritage Place 2009 Fall Mixed Sale for a total price of $112,900. The payments were made via wire transfer from BASIC ENTERPRISES. This included Quarter Horses MERRY FOR MONEY and THANKS JEN which were later transferred to 66 LAND LLC.

113.   On January 14, 2010 RAMIRO VILLARREAL purchased 5 horses at the Heritage Winter Mixed Sale for a total of $89,400. This included Quarter Horse JESS CHARMING. This horse was transferred to 66 LAND LLC.

114.   FRANCISCO COLORADO CESSA joined the money laundering conspiracy in 2009 when they began to assist the organization in purchasing horses.

115.   FRANCISCO COLORADO CESSA has allowed LOS ZETAS Drug Trafficking Cartel to use his businesses. Information obtained from the Federal Bureau of Investigation details that during March 2012, a gun battle between Mexican Federal Police and members of the LOS ZETAS Drug Cartel took place at the ranch owned by FRANCISCO COLORADO CESSA near Vera Cruz, Mexico. A LOS ZETAS plaza boss, ENRIQUE DELGADO FRAIRE, was killed along with one other gunman. Seven other members of the organization were wounded.

116.   Surveillance and records obtained from Los Alamitos Equine Sales, Heritage Place, and Ruidoso Downs Horse Sales Company show that FRANCISCO COLORADO CESSA assisted in the purchase of horses. The surveillance and records reveal the following:

117.   Records obtained from the Ruidoso Horse Sales Company Yearling Sale held on September 4, 2009 show that FRANCISCO COLORADO CESSA purchased 13 horses at

the sale for a total of $546,500. They paid $516,500 with a check drawn on the American Express Bank International account of FRANCISCO A. COLORADO C. This purchase included Quarter Horses MORNING CARTEL and FEATURE HONOR that were later transferred to JOSE TREVINO or one of his companies.

118.    During the Ruidoso Horse Sales Company Yearling sale held on September 3 – 5, 2010 the organization purchased a number of horses.

119.    Federal Bureau of Investigation agents observed JOSE TREVINO, CARLOS NAYEN, and others. Two males, later identified as RENE RUIZ and RAUL RAMIREZ bid on some horses on behalf of NAYEN and TREVINO. RUIZ and RAMIREZ were raising their hands for the bids while NAYEN was making telephone calls, photographing the horses and apparently reporting the results. After the bid was won, NAYEN would take pictures of the auction board that showed the purchase price and text it to an unknown third party.

120.    Records obtained from the Ruidoso Horse Sales Company show that members of the organization purchased 23 horses for $2,240,700. The manager of the Ruidoso Horse Sales Company was concerned whether RENE RUIZ and RAUL RAMIREZ had good money considering the number of horses they bid on and the line of credit that they had racked up, and because they were so young. RENE RUIZ and RAUL RAMIREZ said their money was good. After the auction, FRANCISCO COLORADO CESSA provided a check in the amount of $2,240,700 to pay for the horses. FRANCISCO COLORADO CESSA was listed on the auction paperwork as the owner.

121.    Records obtained from the American Quarter Horse Association showed that the ownership on a number of these horses has transferred to other members of the organization to include, JOSE TREVINO under TREMOR ENTERPRISES LLC, ARMANDO CABREREA DE LA VEGA under DESIREE PRINCESS RANCH LLC, and CARLOS NAYEN under CARMINA LLC

122.    Records obtained from the Heritage Place 2012 Winter Mixed Sale held on January 18-21, 2012 in Oklahoma City and records from Bank of America show the following.

FERNANDO GARCIA assisted in the purchase of 5 horses and 2 Foals in Utero. The horses were placed in the names of MIKE REYNOLDS, ROY GONZALES ZANCHEZ, ALEJANDRO LAGUNES, ROBERT MARQUEZ, JUAN CARLOS GARCIA and SALVADOR RACHUAN SINDICATO. The total cost was $280,400. ADT PETRO SERVICIOS wired $228,700 on February 15, 2012 to cover part of the cost.

**Affidavit - page 28**

A balance of $52,700 was left to be paid. On February 28, February 29, and March 1, 2012 some person or persons went to the Bank Of American in Laredo, Texas and made 8 currency deposits into the Heritage Place account to pay the balance. 4 of the deposits were for $9,900. The other 4 deposits completed the rest of the payment.

The organization purchased more horses using funds sent through GRUPO ADUANERO INTEGRAL AGENCIA ADU.

123.    During the Heritage Place Quarter Horse Yearling Sale from September 16-18, 2010, the organization purchased 31 horses under various names to include for a total cost of $758,800. Most of the payments were made with wire transfers from GRUPO ADUANERO INTEGRAL AGENCIA ADU. These purchases included Quarter Horses BIG DADDY CARTEL ($113,000), IMA PERRY ($50,000), and JESS SASS DASH ($150,000), which were transferred to JOSE TREVINO or one of his companies. A number of these purchases were transported to Southwest Stallion Station to be boarded. They were in various names but CARLOS NAYEN oversaw the payments for the boarding.

124.    Records obtained from the Los Alamitos Equine Sales on October 2-3, 2010, show that SALVADOR BERRON, RAMIRO VILLARREAL, RACHUAN SUAREZ, and others bought 5 horses in the name of GRUPO ADUANERO INTEGRAL AGENCIA ADU for approximately $442,000. Wire transfers from GRUPO ADUANERO INTEGRAL AGENCIA ADU were used to pay for the horses.

125.    During the Heritage Place sale on January 13, 2011, FRANCISCO COLORADO CESSA, MARCO BAEZ, EFREN GARCIA and ANTONIO SELEN assisted the organization in purchasing 6 horses and 5 embryos for $546,200. The money was wired from GRUPO ADUANERO INTEGRAL AGENDA.

126.    Records obtained from Heritage Place Fall Mixed Sale held on November 5, 2011, show that JOSE TREVINO brought 4 horses to be sold. JOSE TREVINO sold BLUES GIRL CHOICE for $102,000, DEVIL RIDGE for $100,000, NUMBER ONE CARTEL for $280,000 and FORTY FORCE for $40,000.

127.    Records obtained from Bank of America show that JOSE TREVINO wrote check # 1144 on TREMOR ENTERPRISES LLC BANK OF AMERICA ACCOUNT # XXXX XXXX 1054 on February 11, 2011 in the amount of $70,000 for the "purchase" of NUMBER ONE CARTEL.

128.    Quarter Horse NUMBER ONE CARTEL was sold by JOSE TREVINO for 4

times the purchase price.

129.   Evidence suggests that JOSE TREVINO sold the 4 horses to his own entourage as the total amount of $733,500 paid for all 12 horses came from ARIAN JAFF/QUICK LOANS.

130.   On November 14, 2011 and on January 24, 2012, CI #3 was interviewed by law enforcement.  CI #3 provided the following information:

131.   FNU BARRADAS bought a lot of horses for "40."  BARRADAS was a well known businessman in Veracruz, Mexico.  He was elected to be President of his community in Veracruz and requested that TREVINO take TREVINO's horses out of BARRADAS' name.  NAYEN commented to CI #3 that "40" would probably kill BARRADAS for that.

132.   On one occasion, "42" told CI #3 to have CI #6 (the organization's biggest Dallas cocaine distributor) send between $200,000 to $300,000 in cash to Oklahoma to purchase a horse directly from the owner.

133.   Money used to pay the horse expenses would come from the distribution of cocaine.  The money would come to Piedras Negras, Mexico where it would be separated. Some of the drug proceeds would be given to CARLOS NAYEN to pay for horse related expenses. CI #3 would usually send between $150,000 to $300,000 at a time to NAYEN.

134.   CARLOS NAYEN had a worker known as YOYO.  NAYEN and YOYO would put money into Money Exchange Houses in Nuevo Laredo, Mexico.  NAYEN would then buy pesos, then convert the pesos back to dollars then wire the money to debtors in the United States.

135.   CI #3 met JOSE TREVINO in Mexico.  JOSE TREVINO came to meet with "40" and brought an excel sheet of expenses that needed to be paid for the horses.  At this meeting were RAMIRO VILLARREAL, JOSE TREVINO, "42," and CARLOS NAYEN.  The meeting took place in November of 2010 after MR PILOTO won the All American Futurities. CI #1 used CI #3's computer to print the list, gave the list to CI #3, and asked CI #3 to give FNU LNU, a.k.a. YOYO, currency to pay the expenses.  YOYO is the right-hand-man of NAYEN.  The list totaled $1,800,000 with an average of $200,000 per month of expenses accrued by TREVINO's horses. CI #3 sent the money CI #3 received from cocaine sales to YOYO and the bills then got paid.

136.   CI #3 said from September of 2010 till March of 2011 CI #3 separated or directed

approximately $2,000,000 to go towards "40's" Quarter Horse interests in the United States.

137.   CI #3 said that TREVINO used a pill called Rectalin to dope their horses. NAYEN was sent to Juarez, Mexico to purchase these pills for $1,000 before the All American Futurities.  They gave these pills to MR PILOTO 15 days prior to the race.

138.   Between September of 2010 and March of 2011, CI #3 sent money to NAYEN four times at Lone Star Park race track in Grand Prairie, Texas for a total of $250,000. Another trainer that the group uses, EUSEVIO HUITRON a.k.a. CHEVO was sent $200,000 to purchase horses.  VILLARREAL, whom was the original horse purchaser at auctions for "40," was sent $300,000 to pay for horses purchased at Ruidoso, Los Alamitos, and Oklahoma (these are the three main sites of Quarter Horse auctions in the U.S.).  An additional $400,000 was sent to YOYO in Nuevo Laredo.  The money sent to VILLARREAL was sent in a vehicle with a hidden compartment to Monterrey, Nuevo Leon, Mexico.

139.   CI #3 knew some of the various straw companies used by "40" to race his horses; GARCIA CABALLOS Y CARRERAS, TREMOR ENTERPRISES, FAST & FURIOUS LLC., CARMINA, and S Quarteck.  MIGUEL TREVINO bragged in front of CI #3 that the horse business was an easy way to launder money.

140.   Records obtained from the American Quarter Horse Association shows that a number of the horses purchased at the auctions in Oklahoma City, New Mexico, and California were eventually transferred to the name of JOSE TREVINO or one of his companies to include TREMOR ENTERPRISES LLC, 66 LAND LLC and/or ZULE FARMS LLC.

141.   In January 2012, JOSE TREVINO filed paperwork with the Oklahoma Horse Racing Commission claiming that 66 LAND LLC had purchased 38 mares on January 29, 2012.

**LAUNDERING OF PROCEEDS THROUGH THE BUSINESS BANK ACCOUNTS OF JOSE TREVINO AND ZULEMA TREVINO TO INCLUDE BANK OF AMERICA TREMOR ENTERPRISES LLC ACCOUNT #4880 2680 1054, BANK OF AMERICA TREMOR ENTERPRISES LLC ACCOUNT #4880 3073 7266, AND BANK OF AMERICA 66 LAND LLC ACCOUNT #4880 2998 4143.**

142.   Records were obtained from The Horsemen's Bookkeeper, which maintains some of the racing records and winnings of horses that race in the state of Texas.  The records

show the following:

143. On November 28, 2009, the Horsemen's Bookkeeper account of JOSE TREVINO was credited $491,901.66 because TEMPTING DASH won the Texas Classic Futurity. This money would not have been available except for the money laundering activities described in the TEMPTING DASH section of this affidavit.

144. The Horsemen's Bookkeeper issued a $441,855.23 check to JOSE TREVINO on December 11, 2009 which was deposited into his personal Bank Of America bank account #XXXX XXXX 5000.

145. JOSE TREVINO opened another account with The Horsemen's Bookkeeper under the name of TREMOR ENTERPRISES LLC on January 19, 2010.

146. Records from Bank of America relating to JOSE TREVINO and his business, TREMOR ENTERPRISES LLC were obtained and analyzed.

147. JOSE TREVINO opened Bank of America account XXXX XXXX 1054 on December 2, 2009 under the name of TREMOR ENTERPRISES LLC.

148. JOSE TREVINO transferred $435,000 from his personal Bank of America account XXXX XXXX 5000 to his TREMOR ENTERPRISES LLC account XXXX XXXX 1054 on December 21, 2009. The $435,000 was part of the purse winnings generated by TEMPTING DASH at the Texas Classic Futurity and would not have been available except for the laundering of proceeds through TEMPTING DASH detailed in this affidavit.

149. In addition to the transferring of funds between accounts, JOSE TREVINO through the TREMOR ENTERPRISES LLC account XXXX XXXX 1054 expended some of the money to pay for expenses related to TEMPTING DASH and other horses.

150. Records obtained from the American Quarter Horse Association show that a horse originally named MAVERICK PERRY (MR PILOTO) was purchased by RAMIRO VILLARREAL on September 17, 2009 for $81,000. The name of MAVERICK PERRY was changed to MR PILOTO. On July 10, 2010, the ownership of MR PILOTO was changed to TREMOR ENTERPRISES LLC.

151. Bank of America records relating to JOSE TREVINO's account XXXX XXXX 5000 and TREMOR ENTERPRISES LLC account XXXX XXXX 1054 do not reflect any funds being paid to GARCIA BLOODSTOCK & RACING in or about July 2010 for

the purchase of MR PILOTO. (As indicated earlier in this affidavit, MR PILOTO was transferred to TREMOR ENTERPRISES LLC, and the transfer date was back-dated).

152.    Records obtained from the Los Alamitos Quarter Horse Racing Association show that TREMOR ENTERPRISES LLC c/o JOSE TREVINO raced Quarter Horse SEPARATE FIRE, which was obtained by JOSE TREVINO with funds wired from Mexico, in California races during the 2011 racing season.  SEPARATE FIRE has won or placed in a number of races and has won approximately $628,450.  The Los Alamitos Quarter Horse Racing Association has issued a number of checks payable to TREMOR ENTERPRISES LLC.

153.    These funds would not have been available to JOSE TREVINO except for the money laundering activities involving SEPARATE FIRE.

### Connection of JOSE TREVINO, ZULEMA TREVINO AND TREMOR ENTERPRISES LLC to 12909 TIMOTHY LANE, BALCH SPRINGS, TEXAS

154.    Law Enforcement has obtained records for accounts belonging to JOSE TREVINO and ZULEMA TREVINO and Limited Liability Corporations established by JOSE and ZULEMA TREVINO.  The most updated bank records obtained by law enforcement for accounts registered to JOSE M TREVINO and ZULEMA TREVINO at BANK OF AMERICA ACCOUNT #0000 0000 5000 encompass statements ending April 26, 2012. These statements were mailed to 12909 TIMOTHY LANE, BALCH SPRINGS, TEXAS.

155.    Records obtained from the Los Alamitos Quarter Horse Racing Association show that TREMOR ENTERPRISES LLC c/o JOSE TREVINO, 12909 TIMOTHY LANE, BALCH SPRINGS, TEXAS.  This account was established by JOSE TREVINO to race quarter horses at the Los Alamitos race track in Los Alamitos, California.

156.    A check with Dallas County water control district #6 show that JOSE TREVINO has had a water account for 12909 TIMOTHY LANE, BALCH SPRINGS, TEXAS since July 2000.

157.    On May 30, 2012, the Grand Jury in Austin, Texas returned an indictment on 15 subjects connected with the money laundering operation outlined in this affidavit.  On June 1, 2012, the Honorable Andrew Austin, U.S. Magistrate Judge, signed a tracking warrant in Cause No. A-12-M-322 for the geo-location data from a cellular telephone in the possession of JOSE TREVINO-MORALES based on the returned grand jury indictment and pending arrest warrant.  On June 2, 2012, tracking information obtained from the target telephone showed JOSE TREVINO-MORALES traveling from Dallas

**Affidavit - page 33**

and arriving in Balch Springs, Texas.

## CONCLUSION

Based on the evidence presented in this affidavit, there is probable cause to believe that LOS ZETAS Drug Cartel provided money generated from specified unlawful activities to include cocaine trafficking, extortion and bribery to obtain Quarter Horses in the United States. The organization used a number of people to purchase the horses and they were placed in company and nominee names. This was done to conceal the true source of the funds and to conceal the control and ownership of the assets.

Once the horses were purchased, LOS ZETAS Drug Cartel continued to supply money generated from the specified unlawful activity to continue the ongoing illegal money laundering activities by paying for boarding, medical and racing expenses.

The ultimate goal of this money laundering operation was to provide JOSE TREVINO with apparent legitimate assets purchased and maintained by illegally obtained money.

Based on interviews with CIs, surveillance conducted by investigators of this money laundering operation, and the analysis of open source records and Grand Jury Financial records, your affiant has probably cause to believe that the property located at 12909 TIMOTHY LANE, BALCH SPRINGS, TEXAS contain evidence of the money laundering investigation to include:

Horse ownership and transfer records from the American Quarter Horse Association.

Financial accounting records of billing to nominee names to further the conspiracy.

Bank Statements from JOSE TREVINO and ZULEMA TREVINO.

Computer software with records of payments received, which horses were bred to whom, and nominee ownership records.

Checks, bulk cash, and wires received from nominee accounts to further the money laundering conspiracy.

Cellular telephones for direct communication to LOS ZETAS leaders in Mexico. These phones are considered filing systems and will have evidence of communications from LOS ZETAS leaders and nominee account holders directing JOSE TREVINO on further actions.

Based on the information developed during this investigation, as well as your affiant's training and experience, it is believed that located within and around the premises located at the property of 12909 TIMOTHY LANE, BALCH SPRINGS, TEXAS, to include vehicles on the search site or located immediately adjacent there to, any out buildings to include barns, and recreational vehicles, evidence of the money laundering conspiracy.

Jason R. Preece
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me this the 11th day of JUNE , 2012.

Jeff Kaplan
United States Magistrate Judge

**Affidavit - page 35**